IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOHN B. CORR, *et al.*,               )
                                       )
              Plaintiffs,              )
       v.                              )
                                       )        No. 1:11-cv-389 (AJT/TRJ)
METROPOLITAN WASHINGTON                )
AIRPORTS AUTHORITY,                    )
                                       )
              Defendant.               )
_____)

## MEMORANDUM OPINION

As alleged in the Complaint, Plaintiffs John B. Corr and John W. Grisby

(collectively "Plaintiffs") are residents of Virginia who, for the past 15 years or more,

have used and continue to use the Omer L. Hirst-Adelard L. Brault Expressway, also

known as the Dulles Toll Road (the "Toll Road"). Concerned by the continuing increase

in tolls assessed for the use of the Toll Road, the cost of the Metrorail extension to Dulles

Airport financed through the increase in tolls, and what the Plaintiffs perceive as a lack of

authority and accountability on the part of an unelected entity that establishes those tolls,

the Plaintiffs filed this class action against the Metropolitan Washington Airports

Authority ("MWAA") on behalf of themselves and all drivers who have used the Toll

Road in Virginia since 2005. At the heart of Plaintiffs' claim is the contention that they

have been, and are continuing to be, subjected to tolls for their use of the Toll Road they

consider excessive. In that regard, and as discussed in more detail below, Plaintiffs claim

that because the amount of these tolls were set, not to cover costs associated with

maintaining and operating the Toll Road itself, but in order to generate funds necessary to

cover the costs associated with the construction of a Metrorail line extending to Dulles

International Airport ("Dulles Airport"), such tolls constitute a "tax," and because this "tax" has been assessed by MWAA, an unelected body, it constitutes an "illegal exaction" in violation of the Due Process Clause of the Fifth and Fourteenth Amendments and the guarantee of a "Republican Form of Government" under Article IV, § 4 of the United States Constitution, as well as a violation of the Virginia Constitution's prohibition on the establishment of a government "separate from, or independent of, the government of Virginia," set forth in Article I, § 14. Based on these claims, the Plaintiffs seek "to halt MWAA's continuing illegal exaction of money from the users of the Dulles Toll Road and to secure for them the return of all money illegally exacted through the tolls for the Dulles Toll Road – that is, the amount of money that exceeds the amount that would have been collected from 2005 through the final judgment for this action had the toll structure before the 2005 toll increase remained in force – plus interest." Compl. at 8.

On May 5, 2011, MWAA filed a Motion to Dismiss for Failure to State a Claim, Doc. No. 6, on the grounds that Plaintiffs do not have standing to bring this suit and that Plaintiffs' Complaint fails to state a claim.[1] On May 26, 2011, the Court held a hearing on the motion after which the Court took the motion under advisement. For the reasons stated below, the Court will grant MWAA's motion and dismiss the Complaint with prejudice.

---

[1] MWAA also moved to dismiss on the grounds that all or a portion of the Plaintiffs' claims are barred by the applicable statute of limitations or the doctrine of laches. Because of the Court's rulings on MWAA's other grounds for dismissal, the Court does not reach the merits of these issues.

# I.    FACTUAL BACKGROUND

On September 7, 1950, Congress enacted legislation authorizing construction of a major public airport, in addition to Ronald Reagan Washington National Airport ("Reagan Airport"), in the vicinity of the District of Columbia.[2] 81 Cong. Ch. 905, Sept. 7, 1950, 64 Stat. 770. To facilitate access to what would become Washington Dulles International Airport ("Dulles Airport"), the federal government acquired a broad corridor of land in Virginia, known as the Dulles Airport Access Highway and Right-of-way ("Right-of-way"), between the Interstate 495 Beltway at Falls Church, Virginia and Dulles Airport. The Dulles Airport Access Highway (the "Access Road") which connects Dulles Airport to Interstate 495 (the "Beltway") and Interstate 66 was built on a portion of the federally purchased Right-of-way as part of the overall project. In 1962, Dulles Airport and the Access Road opened under the direct control of the Federal Aviation Administration ("FAA"), an agency that is a part of the Department of Transportation. Compl. ¶ 48. The Access Road is a 13.65-mile highway whose exclusive purpose is to provide rapid access to and from the Dulles Airport. Because of that purpose, there are no general-access exists from the west-bound lanes or the east-bound lanes. No toll or other user fee is imposed on motorists using the Access Road; but

---

[2] This section is taken from the factual allegations of the Complaint, documents filed in support of the motion to dismiss as well as documents from the public record. *See Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating that the district court can consider documents attached to the motion to dismiss, "so long as they are integral to the complaint and authentic" and the district court may "properly take judicial notice of matters of public record.") For the purposes of ruling on a motion to dismiss, the Court must accept as true factual allegations, but need not accept legal conclusions drawn from the facts nor accept as true unwarranted inferences, unreasonable conclusions or arguments. *Id.*

any use of the Access Road by motorists other than for purpose of going to or from Dulles Airport for airport business is punishable by civil penalties. Compl. ¶¶ 49-50.

As development increased in the surrounding Virginia counties, the Access Road came under increased pressure to become an avenue for commuters and other motorists. Compl. ¶ 51. In 1980, in order to address the problem without interfering with the Access Road's purpose of serving as an exclusive artery to Dulles Airport, the Virginia Department of Highways and Transportation ("VDOT") requested the FAA allow Virginia to construct a new toll road within the Right-of-way for the use of non-airport traffic to and from Washington, D.C. and within Fairfax County. Compl. ¶ 52. In 1983, the federal government granted Virginia a 99-year easement within the Right-of-way to construct, operate and maintain a limited access highway to be called the Dulles Toll Road and which is officially known today as the Omer L. Hirst-Adelard L. Brault Expressway (the "Toll Road"). *See* Doc. No. 9-1 (Deed of Easement).

On October 1, 1984, the Toll Road opened over a distance of 16.15 miles between the Beltway and Route 28. Compl. ¶ 54. The Toll Road became a "project" within the jurisdiction of the Commonwealth Transportation Board ("CTB"), which is empowered under Virginia legislation to "[f]ix and collect tolls and other charges for the use of such projects or to refinance the cost of such projects." Va. Code. §§ 33.1-268(2)(n) and 269(5); Compl. ¶ 55. Pursuant to its legislative authority, the CTB set the tolls for the Toll Road at 50 cents at the main toll plaza, 25 cents at the exit ramps, and 35 cents at the ramps to Sully Road and the Greenway, which, as discussed below, remained at that level until 2005. Compl. ¶ 78.

In 1984, the United States Secretary of Transportation appointed an advisory commission to develop a plan for the creation of a regional authority to manage both Dulles Airport and Reagan Airport. *Metropolitan Washington Airports Authority v. Citizens of Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 257 (1991). The Commission recommended that the proposed authority be created by a congressionally approved interstate compact between Virginia and the District. *Id.* In 1985, Virginia and the District passed compact-legislation authorizing the establishment of the recommended regional authority, MWAA. *Id.*; *see also* 1985 Va. Acts ch. 598; 1985 D.C. Law 6-67.[3]

A year later, in 1986, Congress passed the Metropolitan Washington Airports Act of 1986, 49 U.S.C. § 49101 *et seq.* ("Airports Act"), which approved the compact-legislation passed by Virginia and the District. As approved under the Airports Act, MWAA "shall be a public corporate and politic with the powers and jurisdiction conferred upon it jointly by the legislative authority of Virginia and the District of Columbia or by either of them and concurred in by the legislative authority of the other jurisdiction." *Id.* § 49106(a). MWAA is to be governed by a 13-member Board of Directors, each appointed for a six-year term; five members appointed by the Governor of Virginia, three members appointed by the Mayor of the District, two members appointed by the Governor of Maryland, and three members appointed by the President of the United States with the advice and consent of the Senate. 49 U.S.C. § 49106(c).

---

[3] As stated in that legislation enacted by Virginia and the District, the Compact was "for the purpose of acquiring, operating, maintaining, developing, promoting and protecting Ronald Reagan Washington National Airport and Washington Dulles International Airport together as primary airports for public purposes serving the metropolitan Washington area." Va. Code. § 5.1-156(A); D.C. Code § 9-905(a).

The Airports Act authorized MWAA to "operate, maintain, protect, promote, and develop the Metropolitan Washington Airports as a unit and as primary airports serving the Metropolitan Washington area," *id.* § 49104(a)(1), and is independent of Virginia and its local governments, the District of Columbia, and the United States Government. 49 U.S.C. § 49106(a)(2); Va. Code. § 5.1-156(B); D.C. Code § 9-905(b). Congress also directed that MWAA "shall assume all rights, liabilities, and obligations of the Metropolitan Washington Airports on June 7, 1987, including leases, permits, licenses, contracts, agreements, claims. . ." 49 U.S.C. § 49104(a)(6)(A). Congress also directed that MWAA's authority over Dulles Airport "includes the Dulles Airport Access Highway and Right-of-way, including the extension between Interstate Routes I-495 and I-66." 49 U.S.C. § 49103(4). Additionally, MWAA was also to assume responsibility of the FAA's Master Plans for the Metropolitan Washington Airports. *Id.* Those Master Plans reserved the median strip in the Access Road for a future mass transit line. *Id.*; Doc. No. 9-16, Ex. 11 at 4.

The Airports Act also authorized MWAA "to acquire, maintain, improve, protect, and promote the Metropolitan Washington Airports for public purposes," "to levy fees or other charges," "to acquire real and personal property by purchase, lease, transfer, or exchange." 49 U.S.C. § 49106(b). MWAA also has the authority "to issue bonds from time to time in its discretion for public purposes, including paying any part of the cost of airport improvements, construction, and rehabilitation and the acquisition of real and personal property, including operating equipment for the airports," and that such bonds "are not a debt of Virginia, the District of Columbia, or a political subdivision of Virginia or the District of Columbia; and may be secured by the Airports Authority's revenues

6

generally, or exclusively from the income and revenues of certain designated projects whether or not any part of the projects are financed from the proceeds of the bonds." 49 U.S.C. § 49106(2). To implement the Compact, the Airports Act also authorized the United States Secretary of Transportation to lease to MWAA, pursuant to a long-term lease, both airports and the Right-of-way, subject only to Virginia's existing easement for the Toll Road ("Federal Lease"). 49 U.S.C. §§ 49102, § 49104 and 49103(4); *see* Doc. No. 9-26, Ex. 21 (Federal Lease).

Beginning in 1989, the Virginia General Assembly passed a series of statutes, enacted into law, to facilitate the maintenance and expansion of the Toll Road and mass transit in the Right-of-way. First, in 1989, the Virginia General assembly passed the Commonwealth of Virginia Transportation Facilities Bond Act of 1989 (the "Bond Act of 1989"), under which the issuance of bonds were authorized to pay for widening and extension of the Dulles Toll Road. 1989 Va. Acts 960, § 2; Compl. ¶ 59. The Bond Act of 1989 did not explicitly mention mass transit as a permissible purpose for the issuance of bonds, so in 1990, the General Assembly amended § 13 of the Bond Act of 1989 to specifically permit the CTB to "provide for additional improvements to the Dulles Toll Road a*nd Dulles Access Road corridor* including, but not limited, to *mass transit...*" 1990 Va. Acts. ch. 251, § 13, Doc. No. 9-10, Ex. 5 (emphasis added). The 1990 amendments also added § 14 that specifically authorized "the rates fees, and charges" to be used, among other purposes, for the funding of mass transit in the Dulles corridor.[4]

---

[4] Section 14 provides:
> Notwithstanding any other provisions of this act, the rates, fees, and charges established and collected pursuant to § 9 of this act shall not be used for any purpose other than for the payment of debt service on all outstanding notes and bonds, operations and maintenance costs of the facility, the purpose enumerated

7

Then, in 1995, the Virginia General Assembly approved another bond for the Toll Road, again authorizing the CTB to use surplus Toll Road revenues to fund various improvements in the Dulles Corridor, including mass transit. 1995 Va. Acts ch. 560, §§ 2, 14, Doc. No. 9-27, Ex. 22. Pursuant to that authority, in 2001, the CTB passed a resolution that, beginning in 2003, 85% of the surplus revenues from the Toll Road would be set-aside for "mass transportation initiatives in the Dulles Corridor." *See* H.J. Res. 200 (Va. 2002), Doc. No. 9-12, Ex. 7. In 2002, the General Assembly passed House Joint Resolution No. 200 approving the CTB resolution. *Id.*

In 2004, the Virginia General Assembly amended the State Revenue Bond Act specifically to define "Transportation improvements in the Dulles Corridor" as a bond-eligible project. 2004 Va. Acts ch. 807, § 1 (amending Va. Code Ann. § 33.1-268(2)(n)). This legislation gave the CTB express authority under the State Revenue Bond Act to issue its own revenue bonds to fund construction of Metrorail to Dulles using revenues from the Toll Road. *See* Va. Code. Ann. § 33.1-269(2) (Supp. 2010). In 2005, CTB raised tolls on the Toll Road to 75 cents at the main gate and 50 cents at the exit ramps, expressly reserving the entire toll increase to fund Virginia's share of the cost of extending Metrorail to Dulles. Compl. ¶¶ 83-84.

Beginning in December 2005, MWAA proposed that it operate the Dulles Toll Road and oversee the construction of the Metrorail project, including assuming responsibility for "toll rate setting" for the Dulles Toll Road and "for the

in Chapter 615 of the 1989 Acts of Assembly, for the funding of mass transit, and for the funding of additional improvements, as described in § 13 of this act, to the Dulles Toll Road/Dulles Access Road corridor over that portion of that corridor extending from Route 7 at Tyson's Corner in Fairfax County to Route 28 at Sulley Road in Loudoun County. *Id.*

Commonwealth's remaining share of financing for both Phase I and II of the Dulles Metrorail extension." Compl. ¶¶ 87, 90. On March 24, 2006, the Virginia Secretary of Transportation executed a Memorandum of Understanding ("MOU") between VDOT, on behalf of the Commonwealth of Virginia, and MWAA concerning the Dulles Corridor Metrorail Project and the Dulles Toll Road. *Gray v. Virginia Sec'y of Trans.*, 276 Va. 93, 99 (2008). The MOU explains that the Dulles Toll Road was "constructed upon property owned by the federal government and leased to [the MWAA], pursuant to several deeds of easement to the Commonwealth of Virginia for the construction of the Dulles Toll Road." *Id.* The MOU provided that the Commonwealth, acting through VDOT and the CTB, "will transfer possession and control over the Dulles Toll Road right-of-way and all improvements thereto to the [MWAA]," that MWAA will assume all operational, maintenance, toll-setting, toll-collection, debt, and financial responsibility for the Dulles Toll Road, and that MWAA will construct certain phases of the Metrorail Project. *Id.* The MOU also provides that "[revenues collected from the Dulles Toll Road shall be used for any and all costs related to the operation, maintenance and debt service of the Dulles Toll Road, and the design, construction and financing of the Dulles Corridor Metrorail Project." *Id.*

On December 29, 2006, after unsuccessful legislative efforts to prevent Virginia's transfer of the Toll Road to MWAA,[5] VDOT and MWAA entered into a Master Transfer Agreement and Dulles Toll Road Permit and Operating Agreement (the "Transfer

---

[5] Legislation to prohibit VDOT from transferring control of the Toll Road to MWAA was repeatedly introduced in the Virginia General Assembly. *See* H.B. 5010 (Va. 2006) failed (9/28/2006) Doc. No. 9, Ex. 9; H.B. 5068 (Va. 2006) (failed 9/29/2006), Doc. No. 9-15, Ex. 10; and again in 2007, H.B. 1650 (Va. 2007) (Appropriations Bill, Items 427 # 2h and 445 #1h), Doc. No. 9-17, Ex. 12.

Agreement" and the "Permit"). *See* Doc. No. 9-2,9-3, Ex. 2, 3 (Master Transfer Agreement and Permit); Compl. ¶ 99. Under the Permit, MWAA was authorized "to operate the Toll Road and collect Toll Revenues in consideration for the Airports Authority's obligation to fund and cause to be constructed the Dulles Corridor Metrorail Project and other transportation improvements in the Dulles Corridor." Compl. ¶ 99. Specifically, MWAA would: (i) operate the Toll Road and determine the tolls to be charged, after public notice and hearing; (ii) construct the Metrorail Project in the Dulles Corridor; and (iii) use Toll Road revenues solely and exclusively for transportation improvements within the Dulles Corridor. Compl. ¶¶ 99-102, Doc. No. 9-3, Ex. 3 (Permit) at §§ 4.01, 6.01, 7.01.

Litigation over the transfer of the Toll Road to MWAA quickly followed. In January 2007, suit was filed against officials of Virginia and MWAA in the Circuit Court of the City of Richmond to invalidate the Master Transfer Agreement and Permit. Plaintiffs in that case, two Toll Road users, argued that the imposition of tolls to fund Metrorail was an illegal tax under the Virginia Constitution. *Gray et al., v. Virginia Secretary of Transportation, et al.*, 276 Va. 93, 99-100 (2008). The trial court initially dismissed the case based on sovereign immunity; but the Virginia Supreme Court held that sovereign immunity did not bar suit against the Commonwealth of Virginia and remanded the case to the Circuit Court, which on October 22, 2008, granted summary judgment in favor of the defendants, ruling, among other things, that the tolls were not a tax. *Gray v. Va. Sec'y of Transp.*, CL-07-203 (Richmond Cir. Ct. Oct. 20, 2008), Doc.

No. 9-19, Ex. 14.[6]  With the *Gray* suit resolved, on October 29, 2008, the U.S. Secretary

of Transportation certified that MWAA's operation of the Toll Road was a valid "Airport

Purpose" under the Federal Lease and that MWAA could properly use Toll Road

revenues to pay for the Metrorail project.  Doc. No. 9-22, Ex. 17 ¶¶ 10, 12.

On November 1, 2008, VDOT transferred control of the Toll Road to MWAA.

Compl. ¶ 114. Construction on Phase 1 began in March 2009, and is continuing.

In August 2009, another lawsuit was filed challenging plans, then already

underway, to expand Metrorail access. *See Parkridge 6, LLC et al. v. United States Dep't*

*of Trans.*, 2010 WL 1404421 (E.D. Va. Apr. 6, 2010), *aff'd*, 2011 WL 971530 (4th Cir.

Va. Mar. 21, 2011).  Plaintiffs in *Parkridge*, a Virginia-based LLC which owned property

adjoining the proposed development route of the Metrorail and a Virginia-based civic

advocacy group established to monitor the development of the Metrorail construction,

alleged, *inter alia*, that MWAA's collection of tolls violates the Virginia Constitution

because such collection constitutes taxation by unelected officials. *Id.*, at *2.  This Court

granted the defendants' motion to dismiss, ruling that plaintiffs lacked both Article III

and prudential standing and that the federal legislation that approved the interstate

compact that created MWAA preempted any claim under the Virginia Constitution.  *Id.*,

at *4, *6.  The Fourth Circuit affirmed on the grounds that plaintiffs lacked prudential

standing. *Parkridge*, 2011 WL 971530, at *2.

The construction of the Metrorail continues and as of March 2011, Phase 1 was

approximately 33% was complete. *See* Doc. Nos. 9-18, 9-24, Ex 13 & 19.

---

[6] The Circuit Court also ruled initially that MWAA was also immune from suit under the
doctrine of sovereign immunity.  That ruling was not appealed and on remand the case
proceeded only against the Virginia officials. *See Gray*, 276 Va. at 100 n.3, 107.

## II.    STANDARD OF REVIEW

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must set forth "a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In that regard, the Court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995). For that reason, a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 555 U.S. at 556. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 129 S. Ct. at 1949 (2009); *Twombly*, 550 U.S. at 555. A complaint is also insufficient if it relies upon "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S. Ct. at 1949 (internal citations omitted). The central purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," and the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendant to prepare a fair response. *Twombly*, 550 U.S. at 555.

## III.    ANALYSIS

MWAA seeks dismissal of the complaint on the grounds that (1) Plaintiffs lack standing to raise the alleged claims; and (2) the complaint fails to state a claim upon which relief can be granted.

## A. THE COMPLANT

Briefly summarized, the complaint alleges that the tolls paid for the use of the Metrorail construction are "illegal exactions," which are unconstitutional because they are a tax assessment in violation of the principle of "no taxation without representation." Compl ¶¶ 1-4. These "exactions" are claimed to be illegal because:

1. Neither the Virginia General Assembly nor Congress has ever enacted legislation that delegates to MWAA the power to set tolls for the Dulles Toll Road.

2. Neither the Virginia General Assembly nor Congress has the power to delegate to MWAA the authority to set tolls for the Dulles Toll Road because MWAA is an entity completely outside of the Commonwealth and is not composed of federal "officers" or "inferior officers." Rather, it is an unelected, independent and "novel government creature outside of all other forms of government." Compl ¶ 6(a)–(d).

3. Any delegation to MWAA to set such tolls is unlawful because it confers "unlimited discretion" and therefore "constitutes a standardless, unconstitutional delegation of legislative power to MWAA." Compl. ¶¶ 6(c), 138.

4. Regardless of whether the tolls are characterized as "user fees" or "taxes," the tolls set for the Dulles Toll Road exceed "the amount needed to pay a fair approximation of the operating and maintenance expenses of the Dulles Toll Road plus reasonable payments for the debt incurred to construct or improve the Dulles Road" and therefore exceed any lawful delegation to MWAA.

5.  The delegation of authority to set tolls violates the Virginia Constitution; and federal legislation approving the interstate compact cannot preempt limitations on the General Assembly imposed under the Virginia Constitution. The constitutional requirement that Congress must consent to any interstate compact, such as that entered into by Virginia with respect to MWAA, does not authorize Congress "to compel a state to violate that state's constitution, concerning a matter not otherwise governed by the United States Constitution." Compl. ¶ 6(d).

Based on these claims, the Complaint alleges that the tolls established to fund the Metrorail extension are (1) "illegal exactions" in violation of the Fifth and Fourteenth Amendments to the United States Constitution (Count One); (2) deprive the Plaintiffs of "a republican form of government" and "to be governed only by state or local government or by the Federal Government" (Count Three); and (3) violate the Plaintiffs' "privileges and immunities" and "their right to the due process of law, to be taxed only by the enactments of legislatives [sic] bodies elected by them" (Count Three).[7]

## B. STANDING

Under Article III, § 2 of the Constitution, federal courts have jurisdiction over a dispute only if it is a case or controversy. For this reason, Plaintiffs must establish that they have standing to sue. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To establish Article III standing, Plaintiffs must show that: (1) they have suffered an injury in fact that is both concrete and particularized, and actual or imminent; (2) there is a causal connection between the injury and the conduct complained of – the injury has to be fairly

---

[7] Count II of the Complaint also alleged a violation of 42 U.S.C. 1983, which the Plaintiffs withdrew at the hearing held on May 26, 2011.

traceable to the challenged action of the defendant; and (3) it must likely be redressed by a favorable decision of the Court. *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The Court concludes that Plaintiffs have Article III standing to raise the issues alleged in the Complaint.

To meet the first requirement of showing an injury in fact, Plaintiffs' complaint must establish that Plaintiffs have a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to the Plaintiffs. *See Lujan*, 504 U.S. at 560-561, and n. 1 ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way"). In this case, Plaintiffs have alleged an injury in fact, the paying of an unconstitutional toll assessed by a constitutionally infirm entity, MWAA, that is both concrete and particularized, as well as actual, and ongoing.

Plaintiffs' claim to standing is premised on a footing that is distinct from those cases in which a taxpayer lacked standing to challenge the legality of legislation that only indirectly affects them. *See, e.g., Arizona Christian School Tuition Org. v. Winn*, 131 S.Ct. 1436 (2011) (holding that a taxpayer did not have standing to challenge the constitutionality of certain tax credits given to other taxpayers); *Doremus v. Board of Ed. of Hawthorne*, 342 U.S. 429 (1952) (finding plaintiff-taxpayer lacked standing to challenge state law that required public school teachers to read Bible verses to their students because the plaintiff lacked "any direct and particular financial interest" in the suit). Nor is standing precluded, as MWAA contends, based on the holding in *Frothingham v. Mellon*, 262 U.S. 447, 486 (1923) and *Williams v. Riley*, 280 U.S. 78, 80 (1929). In *Frothingham*, a taxpayer-plaintiff argued that she had standing to challenge

15

certain federal expenditures because the allegedly unconstitutional expenditure of government funds would affect her personal tax liability. *Id.* at 486. There, however, unlike here, the taxpayer was only indirectly affected; and "[i]f one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review, but also in respect to every other appropriations act and statute whose administration requires the outlay of public money, and whose validity may be questioned." *Id.* at 488. Likewise in *Williams v. Riley*, 280 U.S. 78, 80 (1929), California imposed a tax on gasoline distributors, and although plaintiffs-drivers' fuel costs were arguably enhanced by the tax, the drivers were not taxed directly.

Here, Plaintiffs challenge the constitutionality of the tolls they have actually paid directly and will continue to pay for the use of the Toll Road, and while this alleged injury is shared by a large number of other members of the public, the injury is nevertheless "actual," "concrete," and "particularized." Likewise, Plaintiffs have alleged an injury that has a causal connection to the challenged conduct; indeed, it is the direct result of the challenged conduct. Finally, there is no doubt that the Court can redress the alleged injury by fashioning an appropriate remedy were it to find that Plaintiffs are entitled to relief. For these reasons, the Court concludes that Plaintiffs have Article III standing to raise the issues they have alleged in the Complaint. [8]

---

[8] The court recognizes that some courts, when faced with comparable challenges to tolls have found no Article III standing, principally on the grounds that the plaintiff's "injury" is indistinguishable from that experienced by millions of other persons who have or will pay the challenged tolls. *See Soling v. New York*, 804 F. Supp. 532 (S.D.N.Y. 1992) (finding that motorists lack specific individualized injury and thus standing to challenge a toll charged by the New York State Thruway Authority and Triborough Bridge & Tunnel Authority). While that circumstance exists in this case (indeed, plaintiffs rely on this

Even where Article III standing exists, courts recognize that certain issues are so inextricably bound up with the political and legislative judgments of the other branches of government that courts should not intrude as a matter of "prudence." For this reason, Courts have refused to intervene in "generalized grievances" arising out of those legislative judgments, which are regarded as "more appropriately addressed in the representative branches." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2000). This self-imposed limitation on the exercise of federal jurisdiction derives from the "constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Allen v. Wright*, 468 U.S. 737, 750 (1984) (quoting *Vander Jagt v. O'neill*, 699 F.2d 116, 1178-79 (1983) (Bork, J., concurring)).

The presence of Article III standing notwithstanding, the Court concludes that Plaintiffs lack standing under the doctrine of prudential standing under the facts of this case. There is no doubt that the issues presented by the Plaintiffs have long been the subject of legislative judgments, made by elected representatives, over complex issues of public policy concerning regional transportation needs occasioned by the development of the Dulles Airport and the related Right-of-way. As in *Soling*, the challenged legislative choices that have been made "are more or less ordinary grist for the mill of democratic

---

commonality of injury to seek class certification for hundreds of thousands, if not millions, of toll payers from 2005 to the present), this aspect alone does not deprive an otherwise qualifying individual of standing. It cannot be the case that an individual plaintiff who, when alone in his injury, has standing to seek redress based on allegedly unconstitutional conduct, loses that standing if the effects of that conduct are too far reaching. Moreover, the courts in these cases, while finding no Article III standing, were clearly more focused on the central concerns embodied in the doctrine of prudential standing. *See id.* at 534-35 ("the Framers did not intend the courts be dragged into disputes over public policy ... [which] would tend to place the judiciary in the inappropriate role of exercising generalized supervision over the legislative and executive branches").

political controversy." *Soling*, 804 F. Supp. 532 at 535. For this reason, the Court concludes that Plaintiffs' constitutional challenges fall squarely within the prudential standing doctrine, under which courts refrain from exercising jurisdiction over a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

This Court's analysis is guided, if not dictated, by the Fourth Circuit's opinion in *Parkridge 6, LLC v. United States Dep't of Transp.*, 2011 WL 971530 (4th Cir. Mar. 21, 2011). In *Parkridge*, plaintiffs alleged, as here, that MWAA's collection of tolls violated the Virginia Constitution because such collection constitutes taxation by unelected officials. *Parkridge 6 LLC v. United States Dep't of Transp.*, 2010 WL 1404421, at *2 (E.D. Va. Apr. 6, 2010). The district court dismissed the case on the grounds, *inter alia*, that plaintiffs lacked Article III and prudential standing. *Id.* at *4-5. The Fourth Circuit affirmed the dismissal on prudential standing grounds finding that "[w]hether or not the taxes and tolls associated with the Project [pertaining to the expansion of Metrorail access] are unnecessary ... is not a particularized legal injury but a policy question of broad applicability," and found that these claims are "more appropriately addressed in the representative branches." *Parkridge*, 2011 WL 971530, at *5 (citing *Elk Grove*, 542 U.S. at 12).

If *Parkridge* does not necessarily foreclose Plaintiffs' case, it cannot be materially distinguished. As in *Parkridge*, Plaintiffs' alleged injuries are shared in substantially equal measure by a large class of undifferentiated persons who use the Toll Road. The alleged injury is the result of a long political process involving multiple jurisdictions, the legislatures of which voted to create MWAA and vest in it broad authority with a Board

18

of Directors appointed by the executive officers of various affected jurisdictions, specifically the mayor of the District, the President of the United States, and the governors of Virginia and Maryland. As in *Parkridge*, the Plaintiffs challenge what is most centrally a policy question that is best left to other branches of government to address. For these reasons, the Court concludes that there is a lack of prudential standing.

## C. MERITS

Given the legal issues involved in this case, the ongoing nature of the project challenged and the long history of litigation concerning these issues in this and other courts, the Courts will consider, in the alternative, the merits of Plaintiffs' claims, their lack of standing notwithstanding

### 1. Plaintiffs' Due Process Challenge (Count One)

Plaintiffs first allege in connection with their Due Process challenge that MWAA is not authorized under federal legislation or Virginia legislation to set the price of the tolls. The position, however, flies in the face of a long series of legislative acts that clearly authorizes MWAA to set tolls. Under the terms of the Compact, MWAA has broad authority to "fix, revise, charge, and collect rates, fees, rentals and other charges for the use of the airports." Va. Code. § 5.1-156(A)(8); 49 U.S.C. § 49106(b)(1)(E) (MWAA "shall be authorized ... to levy fees or other charges"). As mentioned previously, MWAA's authority over Dulles Airport includes authority over the entire Right-of-way on which the Toll Road was built. 49 U.S.C. § 49103(4); Va. Code § 5.1-152. As this Court has already concluded in *Parkridge*, MWAA is authorized under the Compact to levy tolls on the Toll Road. 2010 WL 1404421 at *6.

Plaintiffs also contend that the legislation delegating authority to MWAA is improper; and that in any event, MWAA may not assess tolls that exceed the costs related to the Toll Road for the purpose of funding an extension of the Metrorail system within the Right-of-way. Inextricably bound up with their Due Process challenge is their claim that the tolls constitute not a legitimate user fee but rather a tax that is within the exclusive province of an elected legislative body and the authority to impose such a tax may not be delegated to MWAA. Thus, Plaintiffs argue that to the extent that the Airports Act or any other federal law purports to delegate such power to MWAA it is unconstitutional because it violates the Plaintiffs' right of due process. For the reasons stated below, the Court finds that MWAA's conduct does not violate the Plaintiffs' right of due process.

As an initial matter, the Court cannot conclude, as Plaintiffs contend, that the challenged tolls in this case constitute a "tax," as opposed to a user fee. Plaintiffs' decision to use the Toll Road is optional, not compulsory; the toll collected is not used for unrelated general purposes, but rather for transportation improvements within the same Right-of-way; the United States Secretary of Transportation certified that MWAA's operation of the Toll Road was a valid "Airport Purpose" and that MWAA could properly use Toll Road revenue to pay for the Metorail project under the Federal Lease. *See* Doc. No. 9-22, Ex. 17, ¶¶ 10, 12. Furthermore, as at least one Virginia state court has already ruled that MWAA's imposition of the toll is not a tax under Virginia law. *See Gray v. Virginia Sec'y of Transp.* CL-07-203 (Richmond Cir. Ct. Oct. 20, 2008), Doc. No. 9-19, Ex. 14. Nevertheless, the crux of Plaintiffs' complaint is not so much that they are forced

to pay a tax, but they are forced to a pay a tax imposed by an unauthorized, unelected body, relying on the principle of "no taxation without representation."[9]

There is no doubt that historically, protests against "taxation without representation" motivated the founding generation and certain values expressed in the United States Constitution. Without disagreeing with the broad sentiments expressed in Plaintiffs' position, the Court must also acknowledge that such a principle, as such, was not adopted in the federal Constitution and has not been enforced as such. Rather, Article I, § 8 confers on Congress the broad power "to lay and collect Taxes, Duties, Imposts and Excises;" and as the United States Supreme Court explained early in our history, this power is "general, without limitation ... extend[ing] to all places over which the government extends." *Loughborough v. Blake*, 18 U.S. (5 Wheat) 317, 318-19 (1820). Similarly, in *Heald v. District of Columbia*, the Supreme Court rejected the claim that a congressional tax on intangible personal property of persons residing or doing business in the District was unconstitutional because it subjects the residents of the District to taxation without representation. 259 U.S. 114, 124 (1922). The Court concluded "[t]here is no constitutional provision which limits the power of Congress that taxes can be imposed only upon those who have political representation." *Id*; *see also Adams v. Clinton*, 90 F. Supp. 2d 35, 54-55 (D.D.C. 2000) (concluding that *Loughborough* and *Heald* are binding precedent). Lower courts have likewise refused to recognize a federal constitutional right against "taxation without representation" with respect to a variety of

---

[9] More specifically, the Complaint states that "'[n]o taxation without representation' is not simply some slogan redolent of a past age of patriots and heroes. Rather, it is an ever-vital principle at the heart of representative government and the liberty such government is established to preserve. It embodies an animating proposition of accountability to citizens for any governmental exaction of money from them that has profoundly shaped the United States and the Virginia Constitutions." Compl. ¶ 1.

21

issues. *See Breakefield v. District of Columbia*, 442 F.2d 1227, 1228 (D.C. Cir. 1970),

*cert. denied* 401 U.S. 909 (1971) (where the D.C. Circuit considered and rejected a

challenge to Congress's imposition of an income tax upon District residents.); *Doe v.*

*Maximus*, 2010 WL 4789963, at *5 (M.D. Tenn. Nov. 15, 2010) ("There is no legal basis

for 'Plaintiff's taxation without representation' claim"); *Campbell v. Hilton Head No. 1*

*Public Serv. Dist.*, 580 S.E.2d 137, 140 (S.C. 2003) ("while the American Revolution

may have been spurred on by the rallying cry 'no taxation without representation,' the

federal Constitution that was subsequently drafted contained no express provision

guaranteeing that as a right").

For similar reasons, the Court must also reject Plaintiffs' contention that the

legislative bodies that represent them impermissibly delegated to an unelected body,

MWAA, the authority to tax them. In that regard, it is settled that legislative authority

may be delegated so long as the delegation is limited by "an intelligible principle to

which the person or body authorized to [act] is directed to conform." *Whitman v.*

*American Trucking Assoc.*, 531 U.S. 457, 472 (2001) (internal quotations omitted). When

that principle is applied to the facts of this case, the Court must conclude that the

legislative delegation to MWAA was lawful because Congress clearly set intelligible

boundaries on MWAA's exercise of its power to set tolls. Those boundaries include the

obligation to set "charges for the use of facilities . . . that will make the airport as self-

sustaining as possible . . . ." 49 U.S.C. § 47107(a)(13)(A). MWAA's authority to use

"all revenues" is limited to the "capital and operating costs" of the airports, which include

the Right-of-way. *Id.* § 49104(a)(3). MWAA is, therefore, vested with a precisely

defined mission, and the Airports Act confers an intelligible principle by which MWAA

22

must discharge its duties. Setting tolls that allow MWAA to raise revenue for the construction of the Metrorail, a capital project, is well within the articulated scope of authority delegated to MWAA and the language of that delegation is comparable in detail and limited scope to other approved articulations of delegated authority. *See, e.g., Whitman*, 531 U.S. at 472-75 (approving the EPA's authority to set ambient air quality standards at a level that would protect the public health); *Yakus v. United States*, 321 U.S. 414, 420 (1944) (approving the wartime conferral of agency power to fix prices of commodities at a level that will be generally fair and equitable and will effectuate the purposes of the Act); *National Broadcasting Co. v. United States*, 319 U.S. 190, 225-226 (1943) (approving the Federal Communications Commission's power to regulate airwaves in the "public interest" as an intelligible principle); *see also Whitman*, 531 U.S. at 474-75 (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)) ("we have 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'")[10]

Nor is there any merit to Plaintiffs' contention that MWAA's exercise of toll setting authority is unlawful because it does not issue from the delegation of authority from elected representatives, but is "contractually" effected by the Permit that transferred authority over the Toll Road to MWAA. *See* Doc. No. 17 at 10, 19 (Opposition Brief). This position ignores the federal ownership of the land on which the Toll Road was built

---

[10] Plaintiffs have not cited any cases in which the delegation doctrine was applied to invalidate an interstate compact like MWAA, and seemingly rely on *Whitman*, despite the Supreme Court's determination in that case that Congress did not violate the delegation doctrine when it authorized EPA to promulgate standards under the Clean Air Act to protect the public health. *Id.* at 472.

and the federal and state legislation that confers on MWAA, independent of the Permit, the authority to set rates and raise revenue for the purposes of the airports, which includes the Right-of-way. To the extent the Permit references a transfer of authority to set rates for the Toll Road, it does no more than reference MWAA's pre-existing legislative authority with respect to land and facilities committed to its administration.

For the above reasons, the Court concludes that the tolls set by MWAA with respect to the Toll Road are not unconstitutional or otherwise illegal and therefore are not "illegal exactions" that violate the Due Process Clause or the Privileges and Immunities Clause of the United States Constitution.

### 2. Plaintiff's Claim to a Republican Form of Government (Count III)

Plaintiffs allege that because an unelected body, MWAA, imposes what they regard as a tax, they have been denied the constitutional guarantee of a republican form of government under Article IV, § 4.[11]

As Plaintiffs concede, "[i]n most of the cases in which the Court has been asked to apply the [Guarantee] Clause, the Court has found the claims presented to be nonjusticiable under the 'political question' doctrine." *New York v. United States*, 505 U.S. 144, 184 (1992). In that connection, courts have predictably refused to grant relief under the Guarantee Clause under circumstances similar to that presented in this case.[12]

---

[11] The Guarantee Clause, U.S. Const. art. IV, § 4, provides as follows: "The United States shall guarantee to every State in this Union a Republican Form of Government."

[12] *See, e.g., Soling v. New York*, 804 F. Supp. 532 (S.D.N.Y. 1992), where the district court rejected a drivers challenge of an authority's power to set tolls. As in this case, the Plaintiffs in *Soling* claimed that the rate setting entities acted as independent governments that impose tolls which amount to taxes without consent of the governed, and that the tolls are used in ways not decided upon by elected representatives, contrary to the constitutional guarantee of a republican form of government. 804 F. Supp. at 533.

The protections afforded by the Guarantee Clause are addressed through the jurisprudence that has developed concerning the delegation of legislative authority. As discussed above, the delegation to MWAA was a lawful and constitutional exercise of authority by the Commonwealth of Virginia, acting pursuant to legislation passed by its elected legislature and signed by its elected governor, as well as the elected Congress of the United States and the elected President of the United States. MWAA's independence does not violate Plaintiffs' right to a republican form of government because its authority is circumscribed by legislation and can be modified or abolished altogether through the elected legislatures that created it.

Likewise, there is no merit to Plaintiffs' claim that MWAA's governance structure somehow interferes with the President's authority under Article II to ensure that the laws are faithfully executed or violates the Appointments Clause, Article II, § 2. As described above, MWAA is governed by a thirteen member Board of Directors, three of whom are appointed by the President; five members who are appointed by the Governor of Virginia, three members appointed by the Mayor of the District, and two members appointed by the Governor of Maryland. It is settled, as established by this country's long history of interstate compacts, that the President of the United States is not required to have authority to appoint or remove all of the members of an interstate compact commission in order to satisfy the Appointments Clause. *See Seattle Master Bldrs.*, 786 F. 2d 1359, 1365 (holding that Appointments Clause does not apply to state members of

Although the court dismissed on standing grounds, the court opined that "the use of corporate entities created by statutes passed by elected officials to fulfill governmental objectives ... has a long tradition and has never been held to violate any constitutional provision." *Id.* at 537. The court reasoned that "[e]ntities created by statute rather than by constitutional provision, at the federal as well as state or local levels, can be modified or abolished by statute" leaving the republican form of government intact. *Id.*

an interstate entity); *Columbia Gorge United-Protecting People & Prop. v. Yeutter*, 1990 WL 357613, at *12 (D. Or. May 23, 1990) (same), *aff'd*, 960 F.2d 110 (9th Cir. 1992).

Because MWAA has acted pursuant to a constitutional delegation of authority, the Court concludes that the Plaintiffs have not been denied the right to be governed by a republican form of government. For the same reasons, the Court rejects Plaintiffs' claim that its denial of a republican form of government constitutes a denial of due process.

### 3. Plaintiff's Claims Under the Virginia Constitution (Count III)

Finally, Plaintiffs challenge the constitutionality of the tolls based on limitations set forth in the Virginia Constitution and the continuing vitality of these constitutional limitations, applicable to MWAA, following Congress' consent to the Compact. Specifically, Plaintiffs' Complaint alleges that MWAA's conduct violates Article I, § 14 of the Virginia Constitution , which provides that "no government separate from, or independent of, the government of Virginia, ought to be erected or established within the limits thereof." Compl. ¶¶ 169-179. Plaintiffs' also allege a violation of Article IV, § 1 of the Constitution of Virginia, which vests the legislative power of the Commonwealth in the General Assembly. Compl. ¶¶ 172, 177. Plaintiffs contend, as they do under the federal Constitution, that MWAA is exercising the legislative power of taxation by setting tolls at levels that exceed the amount necessary to pay for operating and maintenance expenses of the Toll Road. Compl. ¶ 177.

Before considering the merits of their constitutional claims under the Virginia Constitution, the Court must first consider whether under the Supremacy Clause of the federal Constitution, Congress's approval of the interstate compact creating MWAA, and

the passage of related federal legislation, preempts any Virginia constitutional provisions that the Plaintiffs rely on. The Court concludes that it does.

The Compact Clause, Art. I, § 10, cl. 3, of the United States Constitution, provides that "[n]o State shall, without the Consent of Congress ... enter into any Agreement or Compact with another State." It has long been settled that "once a compact between States has been approved, 'it settles the line or original right; it is the law of the case binding on the states and its citizens, as fully as if it had been never contested.'" *New Jersey v. New York*, 523 U.S. 767, 810 (1998) (citing *Rhode Island v. Massachusetts*, 12 Pet. 657, 727, 9 L. Ed. 1233 (1838)). *See also New Jersey*, 523 U.S. at 811 (citing *Cuyler v. Adams*, 449 U.S. 433, 438 (1981)); ("[C]ongressional consent 'transforms an interstate compact within [the Compact] Clause into a law of the United States. ) *Bush v. Muncy*, 659 F.2d 402 (4th Cir. 1981) (adoption transforms a compact into federal law at which time its interpretation and construction presented federal, not state questions); *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 33 (1951) (Reed, J., concurring) ("The interpretation of the meaning of the compact controls over a state's application of its own law through the Supremacy Clause and not some implied federal power to construe state law."). MWAA's Compact is, therefore, the law of the United States, which under the Supremacy Clause preempts any Virginia constitutional provisions. Thus, MWAA's authority is to be determined under the Compact. As discussed above, federal legislation, which incorporated the legislative grants embodied in the state legislation creating MWAA, clearly authorized MWAA to set the challenged tolls. *See* 49 U.S.C. § 49106(b)(1)(E) (MWAA "shall be authorized ... to levy fees or other charges").

For these reasons, whatever may be the limitations placed on the Virginia General Assembly under the Virginia Constitution with respect to delegating decision making within Virginia to state agencies, any such limitations cannot undo the interstate Compact that was authorized by the General Assembly once there has been congressional consent and approval, as there was here. To the extent that the Virginia Constitution or a Virginia statute is inconsistent with the Compact, they are preempted by the Compact and related federal legislation under the Supremacy Clause. *See Sims*, 341 U.S. at 34 ("West Virginia adjudges her execution of the compact is invalid as a delegation of state power... Since the Constitution provided the compact for adjusting interstate relations, compacts may be enforced despite otherwise valid state restrictions on state action."); *Parkridge*, 2010 WL 1404421, at *6 (concluding that "MWAA is therefore authorized to levy tolls on the roadway, and any Virginia law or provision of the Virginia Constitution that conflicts with that authority is preempted under the Supremacy Clause of the United States Constitution").[13]

Implicitly recognizing the constitutional roadblock to their position imposed by the Supremacy Clause, the Plaintiffs attempt an end-run by arguing that under the Tenth Amendment federal law may not, under the circumstances of this case, preempt the Virginia Constitution. [14] The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are

---

[13] Based on *Gray*, discussed above, and other Virginia cases, the Court would conclude, in any event, that there is no violation of Virginia's constitutional prohibition on taxation without representation. *See Sims*, 341 U.S. at 28 (concluding that federal courts have authority to review alleged state constitutional violations involving interstate compacts).

[14] The Complaint does not expressly allege a claim based on the Tenth Amendment. Nevertheless, the Plaintiffs raised this issue in their opposition to MWAA's Motion to Dismiss and the Court will address the merits of this claim in order to eliminate the need to consider a request to amend the Complaint.

reserved to the States respectively, or the people." Plaintiffs argue that under the Tenth Amendment, Congress did not have the power through its exercise of authority under the Compact clause to "force" Virginia to pass legislation in violation of Virginia's constitutional proscription against taxation-without-representation. But certain powers have been delegated to the United States through the Compact Clause, and once a compact becomes federal law, as it did in this case with respect to MWAA, "it lay[s] beyond the judicial power of any party state to declare the Agreement not binding upon the state, even on state constitutional grounds, and its provisions, interpreted as federal law, must prevail over any existing or subsequently created provisions of state law in direct conflict." *Bush v. Muncy*, 659 F.2d 402, 410 (4th Cir. 1981). The Tenth Amendment provides the Plaintiffs no basis for relief in this case.

## IV.    CONCLUSION

For the above reasons, the Court concludes that Plaintiffs do not have prudential standing to bring their claims, and in any event, their complaint fails to state a claim upon which relief can be granted. The Court will dismiss the Complaint with prejudice.

The Court will enter an appropriate Order.

_____/s/_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 7, 2011